**ROYCE INTERNATIONAL BROAD-CASTING COMPANY, Appellant,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Ponce-Nicasio Broadcasting, Intervenor.

No. 84–1639.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1987.
Decided June 30, 1987.

Richard S. Rodin, with whom Lee E. Berner, Washington, D.C., was on the brief, for appellant.

David Silberman, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

James P. Riley and James G. Ennis, Washington, D.C., entered appearances for intervenor, Ponce-Nicasio Broadcasting.

Before MIKVA, BUCKLEY, and WILLIAMS, Circuirt Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

Appellant Royce International Broadcasting Company challenges the Federal Communications Commission's dismissal of its application for a television station license. The Commission based its dismissal on two grounds: first, that Royce had failed to establish good cause for amendments to its original application, and second, that even with the proffered amendments the application lacked crucial engineering data. Royce asserts that the Commission's rejection of its amendments was arbitrary and capricious and that the record fails to support the finding of a fatal gap in the data. We affirm.

## I. BACKGROUND

Royce, along with eleven other applicants, met the Commission's initial filing deadline, or "A" cutoff date, in a licensing proceeding for a new UHF television station in the Sacramento-Citrus Heights area of California. On October 20, 1982, the deadline for filing minor amendments, or "B" cutoff date, Royce submitted an amendment designating a new transmitter site. The amendment, like the original application, was prepared by Royce's principal, Edward R. Stolz II, proceeding *pro se.*

The Commission's Mass Media Bureau designated all twelve applicants for a hearing. *See Hearing Designation Order,* 48 Fed.Reg. 7496, 7498 (Feb. 22, 1983), Joint Appendix ("J.A.") at 54, 57. But the Bureau found that Royce's application had omitted technical information needed to properly evaluate its proposal and instructed Royce to submit this information to the presiding Administrative Law Judge ("ALJ") within 30 days. 48 Fed.Reg. at 7497, 7498, J.A. at 57, 59.

On March 7, 1983 (before the Mass Media Bureau's deadline), Stolz filed the data, but in the wrong place—with the Bureau instead of with the ALJ. In mid-April Royce retained counsel, who discovered this mistake and on April 21 filed for leave to amend to allow filing with the ALJ. A competing applicant, Ponce-Nicasio Broadcasting ("Ponce"), countered with a motion to dismiss Royce's application.

Ponce contended that the new transmitter site named in Royce's October 20, 1982 amendment would have increased the "grade B contour" (a measure of signal coverage area) by more than 50 percent.

If so, the amendment was "major" and thus impermissible at any time after the "A" cutoff date. 47 C.F.R. § 73.3572 (a)(1), (b) (1983).[1] Ponce submitted affidavits from two engineers whose computations indicated that the change would be 59.4 or 56 percent. The Mass Media Bureau agreed with Ponce's experts. Royce hired an engineer and on May 20, 1983 moved to file a second amendment with further changes.

The ALJ denied Royce leave to amend and granted Ponce's motion to dismiss on two grounds. *Trefoil Broadcasting Co.,* FCC 83M–1951 (released June 15, 1983) [hereinafter *ALJ Order*], J.A. at 125. First, the ALJ found that whether or not Royce's April and May 1983 attempts at amendment were considered—that is, under any construction of Royce's proposal—the change in antenna site amounted to an impermissible major change. Second, he found that Royce had not shown good cause for those amendments. The ALJ noted that the Bureau's order was clear and that, given Stolz's experience as a licensee, his filing error was not excused by his *pro se* status. He also cited other FCC proceedings in which Royce had participated[2] and noted that this was "not the first time he ha[d] sought to be excused from the filing rules." *Id.* at 4, J.A. at 128. Royce appealed this decision to the Commission's Review Board.

On August 23, 1983 the Review Board affirmed the ALJ's decision. *Trefoil Broadcasting Co.,* 94 F.C.C.2d 928 (Rev. Bd.1983), J.A. at 147. It agreed that the October 20 amendment was major and found Royce's good-cause argument unpersuasive. *Id.* at 931, J.A. at 150. With some exasperation at Royce's conduct, it concluded that allowing Royce to continue in the proceeding

> would be to condone its pre-designation neglect and post designation fumblings, which cloaked a major change in its application to the comparative detriment of the other parties. This is the third time in five months that we have had to consider serious application deficiencies involving Mr. Stolz, the sole owner of Royce, that appear to result from a lack of attentiveness to his filings with the Commission, unfamiliarity with our rules and policies, refusal to obtain (or benefit from) adequate legal and engineering advice, and possibly worse.

*Id.* at 933, J.A. at 152.[3]

Meanwhile, the licensing proceeding moved forward. A comparative hearing involving the remaining applicants was held on August 9–12, 1983. The ALJ awarded the license to Ponce on January 16, 1984. Five months later the Review Board, over Royce's objection, approved a settlement between Ponce and the five remaining contenders.

On November 29, 1984, after the Review Board's approval of the settlement, the Commission issued its decision—the first of two—affirming the dismissal of Royce. *Royce Int'l Broadcasting Co.,* FCC 84–588, J.A. at 253. It agreed with the ALJ that Royce had failed to demonstrate good cause for acceptance of its April and May 1983 amendments. It rejected Stolz's *pro se* status as an excuse, and noted that a contrary result would disrupt the parties' settlement and require additional hearings. At the same time, however, the Commission rejected the ALJ's and Review Board's holding that the October 20, 1982 amendment constituted an impermissible major change. It recalculated the Grade B con-

---

1. Although § 73.3572(a)(1) was revised in 1984, *see First Report and Order,* 56 Rad.Reg.2d (P & F) 941 (1984), it is undisputed that it controls in this appeal.

2. The ALJ cited three FCC cases in this regard: *Shoblom Broadcasting, Inc.,* 93 F.C.C.2d 1027 (Rev.Bd.1983) (finding a lack of due diligence and other shortcomings and thus denying a petition to amend); *George E. Cameron Jr. Communications,* 93 F.C.C.2d 789 (Rev.Bd.1983) (noting minor rule violations in proceeding in which Royce was granted an AM license); *George E. Cameron Jr. Communications,* 71 F.C.C.2d 460, 468 (1979) (a motion that Royce claimed to have submitted somehow never made it into the Commission's files).

3. The Board's references to earlier deficiencies were supported by citations to two of the three cases cited *supra* note 2: *Shoblom* and the 1983 *Cameron* decision.

tour change and found it to be only 49.2 percent.

Ponce filed a petition for reconsideration of this latter holding, insisting that the October 20 amendment, as elaborated by the April and May 1983 amendments, involved a major change. In response, the Commission reviewed Royce's filings and concluded that "there [were] omissions and errors in the data submitted which ... render it impossible to calculate Royce's service contours with reasonable certainty." *Royce Int'l Broadcasting Co.*, FCC 86–166, mem. op. and order at 3 (released April 17, 1986) [hereinafter *Reconsideration Order*], J.A. at 293, 295. Thus the Commission modified its order to give the incompleteness of Royce's application as an additional ground for denying Royce's petition.

## II. REJECTION OF THE APRIL AND MAY AMENDMENTS

We believe the Commission properly found that in seeking to make its April and May 1983 amendments Royce had failed to establish "good cause," as required under Commission regulations. The Commission's invocation of the settlement agreement and the need for additional hearings was erroneous, but that error does not require remand in these circumstances.

The applicable Commission regulation, 47 C.F.R. § 73.3522(b)(1) (1983) (emphasis added), provides in part as follows:

> *Postdesignation amendment....* [R]equests to amend an application after it has been designated for hearing will be considered only upon written petition properly served upon the parties of record ... and will be considered only upon a showing of *good cause* for late filing. In the case of requests to amend the engineering proposal ... good cause will be considered to have been shown

only if, in addition to the usual good cause consideration, it is demonstrated:

> (i) That the amendment is necessitated by events which the applicant could not reasonably have foreseen (e.g., notification of a new foreign station or loss of transmitter site by condemnation); and

> (ii) That the amendment does not require an enlargement of issues or the addition of new parties to the proceeding.

In *California Broadcasting Corp.*, 90 F.C.C.2d 800, 808 (1982), the Commission set forth the elements of a good cause showing under § 73.3522(b)(1) as follows:

> [T]he applicant must demonstrate that it has acted with due diligence, that the amendment was not required by its voluntary act, that no additional issues or parties would be required, that the hearing process will not be disrupted, that there will be no prejudice to competing applicants, and that the applicant will not gain a comparative advantage.

*See also Shoblom Broadcasting, Inc.*, 93 F.C.C.2d 1027, 1028 (Rev.Bd.1983) (same criteria); *Erwin O'Conner Broadcasting Co.*, 22 F.C.C.2d 140, 143 (Rev.Bd.1970) (setting forth the same criteria in the radio licensing context).

In finding that Royce had failed to show good cause for acceptance of the two amendments, the Commission mentioned three of these six factors: due diligence, unfair prejudice to other applicants, and the necessity of additional hearings. Mem. op. and order at 5, J.A. at 257. Finding these dispositive, the Commission did not discuss the other factors.[4] First we address due diligence, then the impact on the parties and proceedings.

### A. *Good Cause and Due Diligence*

■ On Royce's want of care, the Commission's viewpoint resembled the Review Board's:

---

4. In this appeal, counsel for the Commission stresses the plain language of § 73.3522(b)(1), which places additional burdens on applicants seeking to amend an engineering proposal. Brief for Appellee at 19–20. By the terms of the rule, such applicants must also show that "the amendment is necessitated by events which the

applicant could not reasonably have foreseen" to establish good cause. Although the facts relied upon by the Commission in support of its finding of a want of due diligence seem ample to support an adverse finding under this provision, we must limit ourselves to the points on which the Commission relied.

The chronology of Royce's successive inadequate efforts to comply with the simple and unambiguous directives in the Hearing Designation Order[ ] points up a continuing carelessness by Royce in the prosecution of its application. Royce has not attempted to offer any valid explanation for its errors and delay at any time during the course of this proceeding.

Mem. op. and order at 5, J.A. at 257.

The Commission's factual statements are amply supported and its conclusion is well within its discretion. The Designation Order was indeed unambiguous in directing Royce to file essential information by a certain date at a certain place. Royce filed incomplete and erroneous data in the wrong office before the deadline. When the mistake came to light, it sought to file the same data in the correct office (the attempted April amendment). In response to Ponce's opposition, Royce sought to make corrections or changes even in this data (the attempted May amendment).[5] It was reasonable for the Commission to characterize this course of conduct as one of carelessness rather than due diligence.

■ Similarly, it was reasonable for the Commission to regard Royce's lack of legal representation and engineering expertise as an inadequate excuse. Applicants who proceed *pro se* are not thereby exempt from compliance with FCC rules and orders. Mem. op. and order at 4 n. 15, J.A. at 256 n. 15. The Commission may, of course, consider an applicant's *pro se* status, among other factors, in determining whether a mistake is excusable. *See Simon Geller,* 90 F.C.C.2d 250, 257 n. 33 (1982), *remanded on other grounds sub nom. Committee for Community Access v. FCC,* 737 F.2d 74 (D.C.Cir.1984). But the circumstances of Royce's case suggest that its lack of expert advice should create no unusual equities in its favor. The Designation Order's directives contained no obscurities requiring the interpretative skills of a lawyer; it was, as noted, unambiguous. Furthermore, Stolz, Royce's principal, was not a broadcasting neophyte, but rather a licensee with considerable, if troubled, experience in the ways of the Commission.[6]

■ Royce notes that once its errors were discovered by counsel or pointed out by Ponce, it moved promptly to cure them; thus, it says, it acted with due diligence. *See* Brief for Appellant at 14–17. It quotes a Commission observation that "[t]he crucial period for consideration in determining due diligence dates not from the time the application is filed ... but from the time the applicant is, or should have been, apprised of the problem requiring amendment." *Brownfield Broadcasting Corp.,* 88 F.C.C.2d 1054, 1058 (1982).

Royce reads this language as mandating a finding of due diligence whenever an error is promptly corrected, but the FCC cases cited by Royce simply do not stand for this narrow concept of due diligence. In *Brownfield,* one of the competing applicants for a new FM broadcast station sought to amend its application to correct a mistake in the geographical coordinates of its proposed transmitter site. The coordinates at issue had been used by several previous licensees over a period of years and had never been challenged. 88 F.C.C.2d at 1055, 1057–58. The Commission found that the error could not reasonably have been foreseen, so that the applicant's reliance on these coordinates was justifiable. *Id.* Since the applicant acted promptly after discovery of this unforeseeable error, the Commission found due diligence. *Id.* at 1058.

Thus *Brownfield* does not speak at all to circumstances in which the applicant's own actions give rise to the need to amend. The same is true of other cases relied on by Royce. *See California Broadcasting Corp.,* 90 F.C.C.2d 800, 808–09 (1982) (six-month delay allowed where unforeseen creation of park necessitated amendment of transmitter site, and FCC rules gave no guidance on how to handle complex environmental issue); *Bison City Television 49 Ltd.,* 91 F.C.C.2d 26 (Rev.Bd.1982) (post-designation financial amendments permit-

---

**5.** Even at this point, however, the application was still incomplete. *See infra* Part III.

**6.** *See* cases cited *supra* note 2.

ted where failure of financial plans was not caused by any lack of diligence or inherent defect, and where minority applicant may have faced special financing difficulties).

Other Commission cases indicate that the diligence inquiry concerns not only the timeliness of curative amendments, but also other circumstances, including the responsibility of the party seeking to amend. In *Shoblom Broadcasting, Inc.*, 93 F.C. C.2d 1027 (Rev.Bd.1983), the applicant—Royce, as it happens—sought leave to amend to specify a change in transmitter site. The Board found that Royce had known fourteen months before designation for hearing that the site it proposed was not available. In *Shoblom,* as in the instant case, Stolz's efforts to remedy the problem proved the occasion of further mistakes and misunderstandings. The Board found Stolz "far from diligent" in locating a new transmitter site and amending his application appropriately.[7]  *Id.* at 1029. Thus the Board's diligence inquiry clearly encompassed Royce's responsibility for creating the problem necessitating amendment. *See also Belo Broadcasting Corp.,* 68 F.C.C.2d 1313, 1322 (1978) (amendment rejected because "totality of ... events" showed lack of diligence in obtaining transmitter site and in filing amendment).

In light of *Shoblom* and *Belo,* we think it clear that due diligence as understood by the Commission refers to more than the speed with which an applicant corrects its mistakes. Fault in creating the problem requiring amendment also plays a role.

Royce also argues that Commission practice has been to relax the diligence requirement when the amendment was necessary to remedy disqualifying defects. Ironic as this proposition may seem—the more fatal the defect, the more readily an applicant may make corrective amendments—Royce can point to some support. Most notable is *Gilbert Broadcasting Corp.,* 91 F.C.C.2d 450 (1982), where the Review Board disqualified all four applicants for a new AM radio station. One ground of disqualifica-

tion, applicable to all four, was involvement in ministers' coded broadcasting of illegal lottery tips and results. On this issue the Commission reversed the Board on the merits. One applicant was also disqualified on financial grounds, but sought to amend. Though acknowledging the applicant's want of diligence, the Commission found good cause to allow amendment, concluding:

> We have held that the due diligence requirement must be construed in light of the purpose of our rule: to prevent the disruption of the administrative process. We have also held that the public interest favors the acceptance of amendments curing disqualifying defects, which provides for the maximum choice among qualified competing applicants. In this case, acceptance of [the applicant's] amendments would resolve the uncertainties ... found by the Review Board.... Since we perceive *no substantial questions of fact* concerning these matters, we see no reason to order further hearings. Thus, while we do not condone the lateness of [the applicant's] amendment, *given the peculiar procedural stance of this case,* acceptance would not compromise the public interest.

*Id.* at 462 (emphasis added). On the basis of this and similar Commission statements, *see Anax Broadcasting, Inc.,* 87 F.C.C.2d 483, 489 (1981); *Family Broadcasting Group,* 93 F.C.C.2d 771, 774 (Rev.Bd.1983), Royce infers that lack of diligence is of no consequence when a disqualifying defect has been remedied.

■ Royce would extract from these cases a *per se* rule excusing want of diligence whenever the defect to be cured by amendment is disqualifying. In fact, the Commission's decisions merely identify the interest in a wide choice of applicants as a factor weighing in favor of allowing amendment. (By its nature, the factor is applicable only where the amendment would cure a disqualifying defect.) In *Gilbert* and the cases cited above, allowance

---

7. The Board was even moved to quote Shakespeare: "Due diligence, like ambition, 'should   be made of sterner stuff.'"  *Id.* at 1030.

of amendment was also supported by its comparative simplicity, with the likelihood that it would not disrupt proceedings. Repeatedly, the Commission has spoken of the issue as a factor to be weighed rather than as an automatic excuse. *See Belo Broadcasting,* 68 F.C.C.2d at 1324 ("the fact that the amendments were responsive to disqualifying issues, does not by itself establish good cause"); *Shoblom,* 93 F.C.C.2d at 1030 (Commission found Royce's efforts to correct disqualifying defects were "too little and too late" and spoke of interpreting due diligence "in light of the equities of the case"); *Bison City,* 91 F.C.C.2d at 30; *Anax Broadcasting,* 87 F.C.C.2d at 489.

We see no reason to think that the Commission has abused its discretion in assessing the significance of the disqualifying character of the defects.

### B. *Effect on Proceedings*

■ Besides noting want of due diligence, the Commission observed that acceptance of the amendment would have required additional hearings and the undoing of a settlement agreement. Royce argues that acceptance of its amendments at the time they were first offered (April 21 and May 20, 1983) would not have disrupted the hearing (which did not begin until August 9, 1983). Further, Royce argues that the Commission indulged in impermissible bootstrapping in relying on the settlement, which did not occur until May 1984.

■ We agree that the validity of an ALJ order rejecting an amendment must be judged as of the time it is under consideration by the ALJ. If a judicial officer erroneously dismisses a party and the litigation proceeds in its absence, no reasonable concept of procedural justice calls for the party to lose *because* the officer marched forward without it.

Not only basic fairness but the Commission's and our own precedents require a focus on circumstances as they were at the time the amendment was proposed. *See, e.g., Belo Broadcasting,* 68 F.C.C.2d at 1325. As this court indicated in *Green Country Mobilephone, Inc. v. FCC,* 765 F.2d 235, 239 (D.C.Cir.1985), the existence

of a settlement should not be a factor in evaluating whether an earlier refusal to waive a procedural rule was appropriate. "It is obvious that appellants' rights cannot be compromised simply because other applicants decided to conduct negotiations on the assumption that appellants would not prevail." *Id.*

■ Although the Commission's invocation of the settlement was erroneous, this error did not invalidate its good cause determination. The Commission mentioned the settlement only after concluding that Royce had failed to demonstrate due diligence, suggesting the primacy of the diligence issue. There can be no serious doubt that the diligence determination is by itself sufficient to support the conclusion that good cause was not demonstrated. Indeed, the ALJ found a lack of good cause solely by reference to lack of diligence. *ALJ Order* at 4, J.A. at 128. Especially in the absence of any serious attempt by Royce to show good cause for its amendments (as opposed to its efforts to isolate favorable language from FCC cases), we see no point in remanding for further consideration of this issue.

The Commission's finding that acceptance of Royce's amendments would require further hearings is somewhat ambiguous. It may be that the *ex post* approach that infected the Commission's consideration of the settlement also infects its finding here. The Commission might have validly found that allowance of Royce's amendments at the time offered would have imposed considerable burdens on the other applicants and on the system, but its decision is too cryptic for us to be certain of its analysis. Mem. op. and order at 5, J.A. at 257. Once again, however, the error here does not undermine the adequacy of the Commission's good-cause determination.

In sum, we think the Commission acted within the scope of its discretion in determining that Royce failed to show good cause for the acceptance of its amendment. Royce offered no valid excuse for its filing and technical errors, beyond lack of expert help which apparently did not lie beyond its

means. The Commission apparently saw no equities adequate to mitigate Royce's various failings. We think its view of the matter was reasonable.

## III. ADEQUACY OF THE APPLICATION

■ As reviewed above, the Commission on reconsideration found that, even taking into account the information in the proposed April and May amendments, Royce had not submitted the data necessary to determine whether the change was major.

Royce argues that this conclusion is not supported by substantial evidence. It points out that until this last stage, all hands had managed to resolve the major/minor change issue: the ALJ and Review Board (finding a major change), the Commission in its first pass at the issue (finding no major change), and various consulting engineers (on both sides). Thus, Royce argues, the data must have been adequate.

Substantial evidence supports the Commission's determination. Computation of an applicant's proposed service contour involves consideration of contour maps, signal strengths, and antenna characteristics. *See* 47 C.F.R. § 73.684 (1983). The deficiencies in Royce's data, identified by the Commission in its *Reconsideration Order* at 3–4, J.A. at 295–96, included an internal conflict between a diagram and the narrative description of the antenna pattern, and a lack of any explanation for its effective radiated power ("ERP") computation. The Commission also found that Royce had failed to specify properly "its antenna orientation, or provide antenna patterns or vertical field values which could be used to accurately compute the ERP values." *Id.* at 4, J.A. at 296. The Commission found itself "unable to either duplicate or reasonably approximate Royce's ERP values in a

manner consistent with Section 73.681 of the Rules." *Id.* at 4, J.A. at 296.

Royce has not directly challenged this explanation. Instead, it insists that such omissions could not have passed unnoticed during the protracted period its application was under review. But none of the earlier decisions made findings on the adequacy of Royce's data. The ALJ noted only that "some of the missing [engineering] elements were supplied" in Royce's final (April 21, 1983) submission, and never independently evaluated the data in the application. *ALJ Order* at 4, J.A. at 128. Instead, the ALJ relied on engineering data submitted by Ponce's consulting engineers, who in turn based their calculations on various sources—Royce's figures, their interpretations of what the regulations required,[8] and their best guesses as to how to resolve ambiguities in Royce's submissions.[9] Indeed, the ALJ noted Ponce's caveat that "it was difficult to be completely sure about Royce's Grade B coverage at its first site...." *ALJ Order* at 3, J.A. at 127. The Mass Media Bureau (which supported Ponce's contentions) and the Review Board (which ruled in Ponce's favor) likewise evaluated and approved the calculations of Ponce's engineers, rather than conducting their own analyses. 94 F.C.C.2d at 931–32, J.A. at 150–51.

In its first treatment of the major/minor change issue, the Commission relied on legal rather than technical analysis, concluding that Ponce's engineers had misinterpreted FCC regulations on height-above-average-terrain ("HAAT") calculations. Mem. op. and order at 2–3, J.A. at 254–55. It then relied on Royce's ERP statistics to recompute the service area increase. *Id.* at 4, J.A. at 256.

Ponce, challenging this decision, properly attacked the adequacy of the data in Royce's submissions. The Commission then tackled the problem—the first time any decisionmaker had done so in the whole

8. The two engineers both argued that FCC policy required a minimum height-above-average-terrain figure of 100 feet, rather than the 200 foot figure used by Royce. The ALJ and Review Board accepted this contention, but the Commission rejected it.

9. Marvin Clapp, one of the engineers, found that the ERP data submitted by Royce in opposition to Ponce's motion relied on a different antenna pattern from that in the original application. He purported to rely on the original antenna pattern. *ALJ Order* at 3, J.A. at 127.

proceeding. It found that prior decisions, including its own, erred in failing to question the ERP values submitted by Royce and persuasively identified the controlling ambiguities and omissions. *Reconsideration Order* at 3 & n. 5, J.A. at 295 & n. 5.

We see nothing arbitrary or capricious in the Commission's correction of the earlier errors. Overlooking an error on the first seven tries does not rule out its discovery on the eighth try. That's why people check their figures several times; that's one reason there are multiple levels of review. Here, the Commission's careful, unrebutted technical explanation puts to rest any concern that it has arbitrarily reversed well-founded prior decisions. *Cf. Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C.Cir.1970) (agency must give attentive consideration to lower level decision, but the final decision is the agency's), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

Finally, Royce claims that even if the Commission's determination was correct, it was arbitrary and capricious not to give Royce an opportunity to provide the necessary additional information. But Royce was on notice at least from the ALJ's June 1983 decision that, even with its proposed April and May amendments, there were inadequacies that made calculations difficult. The Review Board, in August 1983, noted that the information regarding the original site was still incomplete. 94 F.C. C.2d at 933, J.A. at 152. Ponce's December 1984 petition for partial reconsideration clearly challenged the adequacy of Royce's technical data. J.A. at 265–66. But at no stage—even after the Commission's second decision—did Royce offer to submit the missing data.

In light of this history, we do not think the Commission acted arbitrarily or capriciously in failing to offer Royce another chance. To fulfill its mandate, the Commission must eventually close the book. We cannot say that it did so too quickly with regard to Royce's application.

*Judgment accordingly.*