24 F.3d 1453
 306 U.S.App.D.C. 345
 CHM BROADCASTING LIMITED PARTNERSHIP, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Beaumont Skywave, Inc., Intervenor.
TEXAS COMMUNICATIONS LIMITED PARTNERSHIP, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Beaumont Skywave, Inc., CHM Broadcasting Limited
Partnership, Intervenors.
 Nos. 92-1263, 92-1271.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 12, 1993.
Decided June 14, 1994.
Rehearing and Suggestion for Rehearing In Banc Denied Oct. 17, 1994.*
 
 On Appeal from Orders of the Federal Communications Commission.
 Michael J. Hirrel, Washington, DC, argued the cause, for CHM Broadcasting Ltd. Partnership, the appellant in No. 92-1263 and the intervenor in No. 92-1271.
 Stephen Diaz Gavin, Washington, DC, argued the cause, for Texas Communications Ltd. Partnership, the appellant in No. 92-1271.
 Gregory Christopher, Counsel, F.C.C., Washington, DC, argued the cause, for appellee. On brief were, Renee Licht, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Robert L. Cook, Counsel, F.C.C., Washington, DC.
 On brief, was Donald J. Evans, Washington, DC, for intervenor Beaumont Skywave, Inc. James A. Kline, Washington, DC, also entered an appearance.
 Before WILLIAMS, SENTELLE and HENDERSON, Circuit Judges.
 Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.
 Opinion concurring in part (Texas Communications Limited Partnership ) and dissenting in part (CHM Broadcasting) filed by Circuit Judge STEPHEN F. WILLIAMS.
 KAREN LeCRAFT HENDERSON, Circuit Judge:
 
 
 1
 In choosing the licensee to operate a Beaumont, Texas FM radio station, the Federal Communications Commission (FCC) designated three mutually exclusive applicants, CHM Broadcasting Limited Partnership (CHM), Texas Communications Limited Partnership (Texas Ltd.) and Beaumont Skywave, Inc. (BSI), for a comparative hearing in which an administrative law judge (ALJ) considered which applicant would best serve the public interest.[1] The ALJ denied Texas Ltd.'s application because its proposed transmitter site constituted an air hazard. Texas Communications Ltd. Partnership, 5 F.C.C.R. 1592, 1598 (ALJ 1990). The ALJ rejected Texas Ltd.'s and BSI's claim that CHM was financially disqualified and awarded the license to CHM after concluding that its application surpassed BSI's. Id. at 1600-01.
 
 
 2
 Both BSI and Texas Ltd. filed exceptions to the ALJ's decision. The FCC Review Board affirmed the ALJ's finding that Texas Ltd.'s proposed tower constituted an air hazard but reversed his finding that CHM was financially qualified. Texas Communications Ltd. Partnership, 5 F.C.C.R. 5876, 5876-79 (Rev.Bd.1990). Accordingly, the Review Board awarded the license to the remaining applicant, BSI. Id. at 5879.
 
 
 3
 After the Review Board denied the requests of CHM and Texas Ltd. for reconsideration, see Texas Communications Ltd. Partnership, 6 F.C.C.R. 1260 (Rev.Bd.1991), the applicants sought review from the FCC. The FCC also denied their requests for reconsideration. Texas Communications Ltd. Partnership, 6 F.C.C.R. 5191 (1991) (Commission Order I ); Texas Communications Ltd. Partnership, 7 F.C.C.R. 3186 (1992) (Commission Order II ). In addition, the FCC dismissed Texas Ltd.'s request to reopen the record so that the Commission could reexamine BSI's qualifications. Commission Order II, 7 F.C.C.R. at 3188.
 
 
 4
 CHM seeks review of the FCC's determination that CHM was financially disqualified from securing the license. Texas Ltd. seeks review of the FCC's determination that its proposed transmitter site would create an air hazard. Texas Ltd. also appeals the FCC's denial of its request to reopen the record to add issues regarding BSI's applicant qualifications. We deny the petitions of both CHM and Texas Ltd.
 
 I. CHM'S PETITION FOR REVIEW
 
 5
 An applicant for an FM radio station license must demonstrate to the FCC that it is financially qualified in order to be licensed by the agency. 47 U.S.C. Sec. 308(b). Before 1981, FCC Form 301 (the form on which broadcast applications are filed with the FCC) required applicants to provide the agency with detailed estimates of construction costs and initial operating expenses as well as documentation establishing the applicant's ability to meet the estimated costs and expenses. In 1981, however, the FCC revised Form 301, replacing the requirement of detailed financial documentation with one question:
 
 
 6
 The applicant certifies that sufficient net liquid assets are on hand or that sufficient funds are available from committed sources to construct and operate the requested facilities for three months without revenue. ___ Yes ___ No
 
 
 7
 In preparing CHM's application for licensing, CHM general partner Beverly Hatcher completed and signed it, answering "yes" to the financial qualification question.
 
 
 8
 When CHM filed its application with the FCC on July 10, 1987, it projected that it would need $482,186 to cover its construction costs and expenses for its first three months of operation (start up expenses). CHM outlined two alternative financing plans to provide the capital. The first plan relied on the oral promise of its limited partner, Kent Foster, to provide whatever amount was needed to cover the station's start up expenses. Alternatively, it relied on a loan commitment letter for $350,000 from East Texas State Bank (ETSB) supplemented by Foster's written pledge of a $150,000 loan.
 
 
 9
 In November 1988, ETSB failed.[2] ETSB's successor refused to assume the CHM loan commitment. CHM did not obtain a new loan commitment letter until March 22, 1989, when National Bank of Washington (NBW) agreed to loan CHM $350,000. During the four-month gap when CHM did not have bank financing in place, it did not notify the FCC. By the time of the initial hearing before the ALJ, CHM had obtained the loan commitment from NBW.
 
 
 10
 The ALJ considered whether CHM had misrepresented its financial qualifications when it filed its application. Although the ALJ found the question "a close one," he ultimately determined that CHM was not guilty of misrepresentation. Joint Appendix (J.A.) at 23 p 60. In reaching the conclusion, the ALJ stated that because "CHM's certification was based partly on a valid bank letter and a timely analysis of the cost of the facility, it is evident that CHM attempted to comply in part. For this reason CHM will not be disqualified." J.A. at 23 p 60. The ALJ further found that CHM was currently financially qualified because the NBW loan combined with Foster's loan would satisfy CHM's start up expenses. J.A. at 22-23 pp 58-59.
 
 
 11
 In August 1990, while the exceptions of BSI and Texas Ltd. were pending before the FCC Review Board, NBW failed and its successor bank refused to honor its loan commitment to CHM. The Review Board found that CHM could not rely on the ETSB and NBW loan commitment letters to establish its financial qualifications because neither letter was currently valid. J.A. at 26, p 9. The Review Board further found that CHM had failed to show that Foster currently possessed sufficient liquid assets or readily convertible nonliquid assets to meet his promise to fully fund CHM's start up expenses because he was at that time also obligated to finance a number of other FCC applicants. Therefore, the Review Board concluded that CHM was not currently financially qualified. As this conclusion disqualified CHM, the Review Board did not decide whether CHM had misrepresented its financial qualifications when it filed its application. J.A. at 27 p 15.
 
 
 12
 CHM sought reconsideration and moved to amend its application to include two new bank letters it had obtained to replace the NBW letter. The Review Board denied both the petition for reconsideration and the motion to amend. J.A. at 29 p 4.
 
 
 13
 CHM appealed to the FCC. The FCC agreed with the Review Board that CHM was not currently financially qualified. The FCC held that CHM could not rely on any of the loan commitment letters it obtained after ETSB failed because: (1) it had never filed an amendment to its application to include the post-ETSB commitment letters as part of its financial proposal; and (2) even if it had sought to amend, CHM had not shown good cause to amend.
 
 
 14
 CHM sought reconsideration of its financial qualifications arguing that it was relying solely on Foster's finances to fund its start up expenses. Therefore, CHM argued, ETSB's failure and CHM's subsequent financing arrangements with other banks had no effect on its financial qualifications. The FCC declined to reconsider.
 
 
 15
 The FCC first found that at the time CHM submitted its application and signed its financial certification, it could not rely exclusively on Foster's financing because Hatcher did not "take steps" to verify Foster's oral promise of funds before she signed the financial certification. J.A. at 37 p 7. Specifically, Hatcher neither requested nor reviewed a financial statement from Foster. In addition, she had no actual knowledge of his assets, liabilities and overall ability to fulfill his promise of financing. The FCC concluded that because CHM did not have reasonable assurance that Foster alone could fund its start up expenses, the ETSB letter was an essential element of its financial proposal. J.A. at 37 p 7.
 
 
 16
 Regarding the ETSB letter, the FCC noted it had made special inquiry of CHM about the continuing viability of its financial certification on May 30, 1989, as a result of BSI's petition questioning CHM's financial qualifications. Although the inquiry occurred six months after ETSB failed, CHM did not inform the FCC at that time that it had replaced the ETSB loan commitment letter with the NBW letter. The FCC found that CHM could rely on the NBW letter only if it showed good cause to amend its application, J.A. at 37 p 8, and that CHM had not shown good cause because it had not shown that it acted with due diligence in substituting the NBW letter for the ETSB letter. In addition, the FCC concluded that CHM had not shown good cause because reliance on the NBW letter created a "question of lack of candor, the resolution of which would disrupt the proceeding." J.A. at 37 p 9. Accordingly, the FCC concluded that CHM was financially disqualified because CHM could not rely on the NBW letter and because it did not have reasonable assurance that Foster could meet his oral promise to pay the start up expenses.
 
 
 17
 CHM challenges the FCC's order in several respects. First, CHM argues that the FCC did not notify it that it was required to amend its application when its financial plan changed or that the individual signing the application had to have actual knowledge of the facts asserted therein. Second, CHM argues that the FCC's imposition of procedural requirements in this case is undermined by a subsequent FCC decision. Finally, CHM argues that the FCC departed from its earlier decisions when it failed to find good cause for CHM's amendment.
 
 A. Notice
 
 18
 An agency commits reversible error when it penalizes an applicant based on standards of which the agency failed to provide notice. Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). We first address CHM's assertion that the FCC did not notify applicants that they must "take steps" to verify the adequacy of their financing before signing the financial certification. Application Form 301 provides that "[d]ocumentation supporting the attestation of financial qualification need not be submitted with this application, but must be available to the Commission upon request." Revision of Form 301, 50 Rad.Reg.2d (P & F) 381, 388 (1981) (Section III Instructions Part C). Nevertheless, a broadcast applicant must have reasonable assurance of sufficient funds to construct the station and operate it without revenue for three months in order to certify its financial qualifications. Q Prime, Inc., 9 F.C.C.R. 1 (1993); Northampton Media Assocs., 4 F.C.C.R. 5517, 5518 (1989), aff'd in pertinent part, Northampton Media Assocs. v. FCC, 941 F.2d 1214 (D.C.Cir.1991).
 
 
 19
 FCC precedent should have notified Hatcher that she did not have reasonable assurance of Foster's ability to fulfill his promise of funds before she signed the financial certification. As the FCC explained in Religious Broadcasting Network, 3 F.C.C.R. 4085 (Rev.Bd.1988), an applicant
 
 
 20
 may not for certification purposes rely simply upon the undocumented assurances of [another] that all of the necessary finances will be forthcoming without acquiring firsthand knowledge of the sufficiency of the assets upon which their personal certification is based. To permit such principals to certify to their financial resources on nothing but the undocumented assurances of other [individuals] would be to negate entirely the efficacy of the sworn certification itself.
 
 
 21
 Id. at 4093 (emphasis added). Hatcher did not have the required reasonable assurance because, as the FCC held, she did not take the steps necessary to ascertain Foster's financial qualifications.
 
 
 22
 To possess reasonable assurance of a financial backer's ability to provide the promised funds when it certifies its financial qualifications, an applicant must "provide substantial and reliable evidence (such as a financial statement or balance sheet) that the lender--when it is a person and not a financial institution--had sufficient net liquid assets on hand to meet its loan commitment to the applicant." Port Huron Family Radio Inc., 5 F.C.C.R. 4562 (1990). CHM has not produced such evidence. Instead, as the Review Board found, Foster did not have sufficient net liquid assets on hand to meet his commitment. J.A. at 29. We, like the Review Board, also reject CHM's argument that Hatcher had reasonable assurance because Foster assured CHM of his commitment and ability to provide the promised funding and because CHM principals were informed by prominent members of the community that Foster could perform. CHM's reliance on these assurances was not sufficient because it does not constitute reliance on objective information, such as a financial statement or balance sheet as the FCC suggested.[3] CHM was not justified in relying on Foster's oral commitment and, accordingly, the ETSB loan commitment letter constituted an integral aspect of its proposal.
 
 
 23
 We also reject CHM's contention that the FCC did not provide adequate notice that CHM was required to amend its application to report ETSB's failure and the substitution of the NBW loan commitment letter. In June 1989, when BSI moved to add financial issues against CHM, the continuing viability of CHM's financial certification was specifically challenged.[4] FCC regulations require not only that an applicant amend its application when it is no longer substantially accurate and complete, but also that:
 
 
 24
 [w]henever there has been a substantial change as to any other matter which may be of decisional significance in a Commission proceeding involving the pending application, the applicant shall as promptly as possible and in any event within 30 days, unless good cause is shown, amend or request the amendment of his application so as to furnish such additional or corrected information as may be appropriate.
 
 
 25
 47 C.F.R. Sec. 165(a). When BSI questioned CHM's financial qualifications, it should have been clear to CHM that the issue "may be of decisional significance."[5] See 47 C.F.R. Sec. 165(a). We therefore reject CHM's notice argument because the provisions of 47 C.F.R. Sec. 165(a) adequately informed CHM of its duty to amend its application to reflect the current status of its financial plan.
 
 
 26
 B. FCC's Subsequent Decision in Georgia Public Telecommunications
 
 
 27
 CHM argues that the procedural requirements imposed by the FCC were altered by its subsequent decision in Georgia Pub. Telecommunications Comm'n, 7 F.C.C.R. 7996 (1992). The FCC decided Georgia Public Telecommunications six months after it refused to allow CHM to amend. In Georgia Public Telecommunications, the applicant obtained and submitted a new bank letter after financial qualification issues arose. The applicant did not amend its application or show good cause for amendment. The FCC nevertheless found that the applicant was financially qualified, apparently basing its decision on the new bank letter. The FCC did not discuss the CHM decision in its later decision. CHM argues that the later decision manifests that its disqualification of CHM was arbitrary and capricious.
 
 
 28
 We have held that the FCC is not bound retroactively by its subsequent decisions and need not explain alleged inconsistencies in the resolution of subsequent cases. See Amor Family Broadcasting Group v. FCC, 918 F.2d 960, 962 (D.C.Cir.1990). As we explained in Amor, "If there is an inconsistency, it would appear more appropriate for the parties to these later cases to contest the inconsistency, than for the present party to base its claim to inconsistency on subsequent opinions." Id. at 962; see also Cellular Mobile Sys. of Pennsylvania, Inc. v. FCC, 782 F.2d 182, 207 (D.C.Cir.1985) (whether case under review was inconsistent with subsequent cases was "a question for another day"). The FCC's allegedly inconsistent decision in Georgia Public Television, therefore, does not affect its earlier decision here.
 
 C. Good Cause
 
 29
 Finally, CHM contends that it has shown good cause to amend its application to reflect its current financing. An applicant seeking to amend its filing after the FCC has designated it for a comparative hearing must show good cause for the untimely amendment. 47 C.F.R. Sec. 73.3522(b)(1).[6] In order to demonstrate good cause under section 73.3522(b)(1),
 
 
 30
 the moving party must demonstrate that it acted with due diligence; that the proposed amendment was not required by the voluntary act of the applicant; that no modification or addition of issues or parties would be necessitated; that the proposed amendment would not disrupt the orderly conduct of the hearing or necessitate additional hearing; that the other parties will not be unfairly prejudiced; and that the applicant will not gain a competitive advantage.
 
 
 31
 Erwin O'Conner, 22 F.C.C.2d 140, 143 (Rev.Bd.1970). Due diligence is an essential requirement of good cause. See Royce Int'l Broadcasting Co. v. FCC, 820 F.2d 1332, 1335 (D.C.Cir.1987) (lack of due diligence alone is enough to defeat showing of good cause). CHM's argument that it exercised due diligence is meritless. Even assuming that CHM did not have notice of its duty to amend its application when ETSB failed, CHM was indisputably put on notice of its duty to do so when its financial qualifications were challenged in May 1989. Had CHM exercised due diligence, it would have come forward with the NBW letter when it responded to BSI's motion to enlarge. Instead, it waited until BSI informed the FCC of ETSB's failure. Because CHM did not exercise due diligence, the FCC correctly denied its attempt to amend.
 
 II. TEXAS LTD.'S PETITION FOR REVIEW
 
 32
 The FCC cooperates with the Federal Aviation Administration (FAA) to ensure that proposed antenna towers will not endanger air navigation. FCC regulations require an applicant to notify the FAA of the proposed construction of its antenna tower if the antenna will exceed a specified height or be built close to an airport. 47 C.F.R. Sec. 17.7. The FAA then determines whether the proposed antenna will constitute a hazard to air navigation. If the FAA concludes that the antenna will not constitute an air hazard, it issues a "no hazard determination." When the FCC receives a "no hazard determination" from the FAA, "the antenna structure is deemed not to involve a hazard to air navigation and the antenna aspect of the application for radio station authorization will be processed accordingly." 47 C.F.R. Sec. 17.4 4(d). If, however, the FAA concludes that a proposed antenna will create an air hazard, "the Commission will take further appropriate action." 47 C.F.R. Sec. 17.4(e).
 
 
 33
 On September 16, 1987, the FAA informed Texas Ltd.'s engineer, Sachs, Freeman, that its proposed antenna would constitute an air hazard because it exceeded FAA height limitations by 300 feet. The FAA communicated with Sachs, Freeman rather than Texas Ltd. directly because Texas Ltd. had previously informed the agency to notify its engineer of potential engineering problems. Apparently, Sachs, Freeman never advised Texas Ltd. of the FAA's air hazard determination. Indeed, Texas Ltd.'s general partner, Andre Woodson, was not aware of the FAA's determination until August 1988.
 
 
 34
 On April 19, 1989, more than eighteen months after the FAA issued its air hazard determination and eight months after Woodson became aware of the air hazard determination, Texas Ltd. filed a petition for leave to amend its antenna site so that its antenna would not create an air hazard. J.A. at 109. The ALJ denied Texas Ltd.'s motion, finding that Texas Ltd. had failed to show good cause for its untimely amendment. Texas Communications Ltd. Partnership, 5 F.C.C.R. 1592, 1598 (ALJ 1990) ("The hearing record establishes that Texas Ltd. was dilatory in resolving the air hazard problem and the FAA has found its current site a hazard to air navigation. In addition, Texas Ltd. has not found a new site that is hazard free."). The Review Board affirmed the finding. Texas Communications Ltd. Partnership, 5 F.C.C.R. 5876, 5877 (Rev.Bd.1990) ("[W]e agree with the ALJ's conclusion that Texas Ltd.'s own dilatory conduct ... required denial of its belated and defective petition to amend.").
 
 
 35
 We agree with the FCC that Texas Ltd. did not act with due diligence as required by Erwin O'Conner Broadcasting Co. v. FCC, 22 F.C.C.2d at 143, and therefore did not make the requisite showing of good cause. Texas Ltd. filed its motion for leave to amend its antenna site nineteen months after the FAA issued an air hazard determination regarding its original site. Texas Ltd. seeks to explain this delay by asserting that Sachs, Freeman never notified it of the FAA's air hazard determination. We find this explanation wholly unpersuasive. Sachs, Freeman was Texas Ltd.'s agent. Indeed, Texas Ltd. informed the FAA that it should communicate directly with Sachs, Freeman as to any engineering difficulties that might arise. Under these circumstances, we impute Sachs, Freeman's notice of the air hazard determination to Texas Ltd. See Big Bay Broadcasting, 4 F.C.C.R. 4676, 4677 (Rev.Bd.1989) (applicant seeking to make post-designation amendment lacked due diligence even though its engineer failed to notify it of FAA's air hazard determination).[7]
 
 
 36
 We reject Texas Ltd.'s argument that in the past when "the Commission has attributed an agent's actions to the applicant, it has done so in cases of aggravated circumstances of repeated failures by the lawyer or engineer and those failures are known to the applicant," Texas Ltd. Brief at 34, because we find no such limitation in the FCC's earlier rulings. See, e.g., Roberts Cellular, Inc., 5 F.C.C.R. 1357 (1990) ("While ... these applicants may not have known that [their agent] failed to contact the site owners at the time they signed and filed their applications, the applicants are responsible for their agent's failure to obtain a reasonable assurance of site availability prior to filing their applications.").
 
 
 37
 We also are not persuaded by Texas Ltd.'s argument that good cause justified its untimely amendment because of the confusion created by electro-magnetic interference (EMI) problems in the Beaumont area. Texas Ltd. explains while it was investigating the feasibility of alternative antenna sites, the FAA informed it that a new FM station in Beaumont on the proposed frequency would combine with two existing radio stations to produce unacceptable interference with the instrument landing system used by the local airport. In fact, according to an engineer hired by Texas Ltd., the EMI problem was so severe that an FAA representative informed Texas Ltd. that the FAA would reject any antenna tower operating on the proposed frequency in Beaumont regardless of its height or location. J.A. at 131. Texas Ltd. asserts that until the EMI problem was resolved, it could not have been expected to amend its application. This argument, however, overlooks the fact that Texas Ltd. needed to amend its application regarding antenna height irrespective of the EMI problem. Texas Ltd. did not learn of the Beaumont EMI situation until two months after the FCC designated the air hazard issue against Texas Ltd. Accordingly, Texas Ltd. had a two-month window during which it could have amended its application without regard to the EMI problem.
 
 
 38
 We also reject Texas Ltd.'s argument that the FCC acted arbitrarily and capriciously by treating it differently from CHM and BSI even though the three applicants were similarly situated. The FCC deemed CHM and BSI technically qualified notwithstanding the FAA's determination that their proposed antenna towers would pose air hazards because of EMI. Texas Ltd. argues that the FCC was arbitrary and capricious in not also deeming it technically qualified. We disagree. Texas Ltd., CHM and BSI were not similarly situated. Texas Ltd.'s original air hazard designation was based on the excessive height of its proposed tower. In contrast, CHM and BSI received air hazard determinations based on the Beaumont EMI situation.[8] The FCC recognized that applicants could not, acting on their own, solve the EMI air hazard problem so it qualified CHM and BSI notwithstanding the air hazard problem on the condition that "the licensee reduce power, cease operation, or take corrective action if interference occurs." J.A. at 33. The FCC could not grant Texas Ltd. a similar conditional qualification because Texas Ltd.'s proposed tower would still create an air hazard due to its excessive height. Accordingly, we conclude that the FCC did not act arbitrarily and capriciously in qualifying CHM and BSI but not Texas Ltd.
 
 
 39
 Finally, Texas Ltd. petitions for review of the FCC's denial of its motion to reopen the record and add issues against BSI. After the FCC granted BSI's application, Texas Ltd. requested that the FCC reopen the record so that Texas Ltd. could present evidence indicating that BSI might have misrepresented its corporate structure. Texas Ltd. also alleged that BSI had misrepresented facts or lacked candor when it certified its financial qualifications.
 
 
 40
 The FCC will accept an applicant's motion to enlarge the issues if it is filed within fifteen days after an order designating an application for hearing has been published in the Federal Register or within fifteen days of discovery of the facts on which the motion relies. 47 C.F.R. Sec. 1.229(b). Otherwise, the FCC will accept the motion only if the applicant can show either that good cause exists for the delay in filing or that "initial examination of the motion demonstrates that it raises a question of probable decisional significance and such substantial public interest importance as to warrant consideration in spite of its untimely filing." 47 C.F.R. Sec. 1.229(b)-(c).
 
 
 41
 Texas Ltd. filed its motion to enlarge the issues on October 3, 1991, see J.A. at 178, over three years after the FCC designated its application for hearing in the Federal Register, see 53 Fed.Reg. 30,466-03 (Aug. 12, 1988). Texas Ltd. argues, however, that its motion was nevertheless filed within fifteen days of discovery of the facts on which its motion rested. The "new facts" consisted of the FCC's decision in Evansville Skywave, Inc., 6 F.C.C.R. 5373 (Rev.Bd.1991). There, the FCC disqualified Evansville Skywave on the ground that its corporate structure was a sham designed to take advantage of the FCC's attribution policies. Texas Ltd. argued that because the passive investor in Evansville Skywave was also a non-voting shareholder in BSI, the FCC had to reopen the record to determine whether BSI's corporate structure was also a sham.
 
 
 42
 We reject Texas Ltd.'s argument that the Evansville Skywave decision was a new fact that extended Texas Ltd.'s long expired deadline to file a motion to enlarge the issues. Facts as to Evansville Skywave's corporate structure were not relevant to BSI's qualifications as a licensee: only facts regarding BSI's corporate structure were relevant to BSI's qualifications. Texas Ltd. did not produce evidence that BSI's corporate structure was a sham; rather, it relied on an inference that BSI's corporate structure must have duplicated Evansville Skywave's because the two applicants shared the same limited partner. In addition, new facts justify enlarging the issues only if they could not have reasonably been discovered earlier. HS Communications, Inc., 7 F.C.C.R. 6448 (1992). Texas Ltd. could have learned the true nature of BSI's corporate structure much earlier through discovery. Accordingly, we reject its argument that it moved to enlarge the issues against BSI within fifteen days of discovering new evidence.
 
 
 43
 Because of the ease with which Texas Ltd. could have explored BSI's corporate structure, we also reject its argument that good cause existed to justify its untimely motion to enlarge. Therefore, we will reverse the FCC's denial of Texas Ltd.'s motion to enlarge only if it raises a question of probable decisional significance and substantial public importance. See 47 C.F.R. Sec. 1.229(c). Allegations as to an applicant's qualifications as a licensee meet section 1.229(c)'s requirement of substantial public importance. Great Lakes Broadcasting, Inc., 6 F.C.C.R. 4331, 4332 p 9 (1991). The only remaining question, then, is whether Texas Ltd. has shown that the issue raised in its petition was of probable decisional significance. An issue is of probable decisional significance if "the likelihood of proving the allegation is so substantial as to outweigh the public interest benefits of proceeding to an orderly conclusion in this proceeding." Richard E. Patterson, 8 F.C.C.R. 1726 p 11 (1993). We agree with the FCC that Texas Ltd. did not establish that its allegations were of probable decisional significance.
 
 
 44
 Texas Ltd. first argues that its allegations that BSI's corporate structure was a sham merited reopening of the record. That Evansville Skywave and BSI share a passive investor and that the FCC has found Evansville Skywave's structure to be a sham do not necessarily support the inference that BSI misrepresented its structure. Moreover, the only facts alleged by Texas Ltd. regarding the passive investor's role in BSI's governance had already been considered by the ALJ during the integration analysis. The ALJ found that BSI's passive investor was not in fact passive and therefore awarded BSI only partial integration credit. See J.A. at 38.
 
 
 45
 Nor do Texas Ltd.'s allegations that BSI is financially disqualified justify reopening the record. Texas Ltd. argues that further investigation is necessary to determine whether BSI's financial certification suffers from the same infirmities as Evansville Skywave's. But speculation alone does not indicate a substantial likelihood that Texas Ltd. could prove that BSI is financially disqualified. Therefore, the FCC correctly denied Texas Ltd.'s motion.
 
 
 46
 For the foregoing reasons, both CHM's and Texas Ltd.'s petitions for review are
 
 
 47
 Denied.
 
 
 48
 STEPHEN F. WILLIAMS, Circuit Judge, dissenting:
 
 
 49
 I agree with much of what the court says, but would remand to the Commission. The present record does not satisfy our minimal requirements for reasoned decisionmaking.
 
 
 50
 1. The Commission said that CHM could not rely on the assets of Kent Foster, a limited partner, to establish its financial qualifications, because CHM's certifying official, general partner Beverly Hatcher, "did not take steps to support certifying CHM's financing with respect to Foster's claimed oral promise of funds." Memorandum Opinion and Order ("Reconsideration "), 7 FCC Rcd 3186, 3187 p 7 (1992). CHM complains that this reasoning is inconsistent with the decision in Port Huron Family Radio, Inc., 4 FCC Rcd 2532, 2537 (Rev.Bd.1989), reversed on other grounds, 5 FCC Rcd 4562 (1990). Port Huron appeared to endorse the view that possession of adequate supporting data by a principal of the applicant would suffice. As a limited partner, Foster appears to be classifiable as a principal (at least the Commission in no way disputes CHM's assertion to that effect), so that his own possession of data as to his finances would seem to pass the Port Huron standard. Yet the Commission has neither distinguished Port Huron nor explained its rejection of that analysis (if that is what it has done).
 
 
 51
 2. No one disputes that where information furnished "in a pending application or in Commission proceedings involving a pending application" "is no longer substantially accurate and complete in all significant respects," it is the duty of the applicant to file correcting information. 47 CFR Sec. 1.65(a). But the Commission's assumption that this duty was triggered here overlooks the nature of the application that CHM filed in accordance with the then-prevailing Commission rules. As the court's decision makes clear, CHM's application simply answered the Commission's Yes-No question as to whether its financial resources were adequate. See Maj. Op. at 1455. In accordance with the then-prevaling rules, it did not submit any supporting data. Thus, so long as CHM's affirmative answer to the financial qualifications question was still valid, it was under no obligation to file amending information when the detailed bases of its financial support evolved.
 
 
 52
 CHM contends that its finances were in substance continuously adequate, despite the failure of the East Texas Savings Bank in November 1988. Specifically, CHM argues that between the failure of ETSB and CHM's securing of an alternative bank letter on March 22, 1989, it had adequate financial support. Even without any bank letter, and even accepting the Commission's exclusion of certain of Foster's assets, it argues, Foster's wealth alone ceased to be adequate only on March 16, 1989, when Foster undertook a $500,000 commitment in support of another broadcast application. See Joint Appendix 288, 302, 537. The gap appearing on March 16, 1989 was filled six days later, on March 22, 1989, by CHM's securing a new letter from National Bank of Washington. Thus, except for a momentary blip, CHM argues that its "Yes" answer was continuously valid. As the "Yes" was unchanged, and CHM had never supplied the underlying detail (until proceedings on the subject of its financial qualifications began), there was nothing for it to "update". The Commission has never responded to this argument, and without an answer one can hardly say that the Commission's conclusion was reasoned.
 
 
 53
 I would remand the case to the Commission for a reasoned decision, which has not yet been forthcoming.
 
 
 
 *
 Tatel, Circuit Judge, did not participate in this matter
 
 
 [1]
 The FCC designated three other applicants for the hearing but they were dismissed from the proceedings before the hearing took place
 
 
 [2]
 CHM's limited partner, Foster, owned 1.6% of ETSB's stock and voted 82% of its stock by proxy. In addition, Foster's mother and sister were ETSB's majority shareholders. Although the evidence indicates that Foster's mother and sister were aware of ETSB's difficulties as early as August 1987, Foster claims that he did not know that the bank was having problems until August 1988. At any rate, Foster did not inform CHM's owners of the failure until November 1988
 
 
 [3]
 The FCC's decision in Port Huron is not to the contrary. In that case, the signatory did not have personal knowledge of the finances of the individual who promised to fund the station's start up expenses. The FCC found that the applicant was nevertheless financially qualified because the signatory had discussed the backer's assets and liabilities with the backer's previous accountant and the accountant was in a position to vouch for the latter's financial status. Here, Hatcher did not confirm Foster's financial status with a disinterested third party with personal knowledge. CHM contends, however, that Hatcher did speak with Foster and that he was in the best position to know his own finances. While this may be true, we cannot say that the FCC acted unreasonably in insisting on objective supporting data or disinterested third parties to corroborate Foster's financial worth
 
 
 [4]
 BSI's motion to enlarge asked the FCC to consider, inter alia, "whether [CHM] is financially qualified to construct and operate its proposed station;" and "whether CHM misrepresented or exhibited a lack of candor to the Commission in certifying that it is financially qualified to construct and operate its proposed station." J.A. at 384
 
 
 [5]
 Instead of informing the FCC of the changes in its financial plan, however, CHM recounted the details of ETSB's loan commitment letter and then stated "CHM possesses and has possessed for nearly two years the necessary documentation" supporting its financial certification. J.A. at 395
 
 
 [6]
 47 C.F.R. Sec. 73.3522(b)(1) provides, in relevant part: "Requests to amend an application after it has been designated for hearing will be considered only upon written petition properly served upon the parties of record ... and will be considered only upon a showing of good cause for late filing."
 
 
 [7]
 Moreover, Texas Ltd.'s argument is substantially undermined by the acts of its general partner, Andre Woodson. Woodson admitted that he was aware of the air hazard decision in August 1988 when the FCC designated the issue for hearing. J.A. at 45-47. Nevertheless, Texas Ltd. did not attempt to amend its complaint until April 19, 1989--eight months later. Even if Sachs, Freeman's failure to notify Texas Ltd. of the hazard determination initially caused Texas Ltd.'s omission, it would seem that Texas Ltd. would have sought leave to amend its application no later than August 1988 when Woodson became aware of the problem
 
 
 [8]
 Although CHM and BSI proposed towers that slightly exceeded FAA height limitations, the proposed towers, according to the FCC, did not so exceed the limitations that their height constituted an air hazard. See Commission Order I, 6 F.C.C.R. at 5195 n. 10. CHM's proposed tower exceed the FAA height limitation by only fifteen feet while BSI's proposed tower exceeded the height limitation by twelve feet. Id. In contrast, Texas Ltd.'s proposed tower exceeded the height limitation by 300 feet